UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARLA ARMSTRONG on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | 1:15-cv-00354-SEB-MJD |
| vs. | ) ) | |
| WHEEELS ASSURED DELIVERY SYSTEMS, INC., WHEELS ASSURED LOGISTICS, LLC, GARY GILES, CYNTHIA GILES, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

Plaintiff Marla Armstrong ("Armstrong") acting on behalf of herself and all others similarly situated ("Drivers") has filed this proposed collective action seeking to recover damages for herself on behalf of former and current delivery drivers employed by Defendants. She has filed a Motion for Conditional Certification and Notice of Collective Action Lawsuit pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Defendants Wheels Assured Delivery Systems, Inc., Wheels Assured Logistics, LLC, Gary Giles and Cynthia Giles (collectively, "Employers") have interposed joint objections to Armstrong's motion and notice. For the reasons explained below, we <u>DENY</u> the motion.

1

**Factual Background**

Ms. Armstrong first began working as a delivery driver with Employers in or about April 2005. Her sole and exclusive route throughout her employment was delivering paper products on behalf of Business Cards Tomorrow ("BCT"), which is located at 351 South Post Road, Indianapolis, Indiana 46219. She began each work day by reporting to the offices of BCT at approximately 11:30 am in advance of starting her route by 12:00 p.m. Ms. Armstrong covered deliveries on BCT Route 2 exclusively from 2005 – 2012. Her route typically took her to Brownsburg, Plainfield, Avon, Danville and the Westside of Indianapolis, which trips covered approximately 90 to 130 miles each day, though she is not able to testify from personal knowledge exactly how many hours she actually worked or miles she drove. The specific location and number of stops Ms. Armstrong made on BCT Route 2 changed each day and the number of miles she drove each day likewise varied. She estimates that on average she would make ten pick-up and delivery stops each day, and the order in which she made her deliveries was up to her to decide. She drove her own personal vehicle to make these deliveries.

Her first delivery each day was to PIP Printing located on West Washington Street, Indianapolis. One of her last stops was Printing Partners located at 929 West 16th Street, Indianapolis. The remainder of her daily routes varied depending on the location of customers who needed deliveries or pickups. She was required to drive back to BCT at the end of the route to drop off any orders that she had picked up during the day. Typically, Ms. Armstrong's work day ended between 3:00 or 3:30 p.m. Ms. Armstrong

acknowledges that, besides herself, there were only approximately 5 or 6 other afternoon route drivers for BCT.  Though she was required to make the afternoon deliveries for BCT and others, she was permitted to work for other companies as well and, in fact, did at times during the final six months of her contract, in particular, on behalf of Able Vending/Minutemen Press.  She was paid $50.00 per day (by Employers until 2008 at which point she began being paid by 4 Fergz, Inc., a different contractor) to run her route and was not reimbursed for mileage or expenses related to the operation or use of her vehicle.  She voluntarily ended her delivery work in May of 2012.

Defendant Wheels Assured Logistics, LLC ("WAL" or "Wheels Logistics") is a federally regulated interstate freight broker engaged in the business of arranging the delivery of freight for customers. The freight for delivery is brokered to/through its related business, Wheels Assured Delivery Systems, Inc. ("WADS" or "Wheels Systems").  Beginning in 2005, Ms. Armstrong, as an independent contractor, was under contract with WADS to make deliveries brokered by WAL.[1] Pursuant to that agreement, she was obligated to cover the expenses of operating her vehicle, including fuel.

WAL offers its customers three different types of services:  route deliveries, conjunctive distribution and on-demand deliver service.  Route deliveries typically start

---

[1] Employers claim that Plaintiff's contractual relationship with WADS ended in 2008 when she entered into a new, but largely identical, "Independent Contractor Agreement" with 4 Fergz, Inc. d/b/a Dynamic Logistic Solutions ("4 Fergz"), who thereafter issued Plaintiff's checks and appeared on Plaintiff's 1099 tax forms. Employers further claim that 4 Fergz is a separate and distinct entity in which none of them has any ownership interest. Plaintiff does not dispute entering into this contract with 4 Fergz, but alleges that it is simply another name under which WADS operated and that the new contract differed only in name and was the result of a merger.

and end at the customer's locations; this was the service provided by Ms. Armstrong. Conjunctive distribution involves freight delivered to WADS who sorts it into deliveries for multiple customers which are then delivered. On-demand delivery services are provided when a customer requires a pick-up and delivery of freight on the same day. Ms. Armstrong never performed any on-demand or distribution deliveries.

WAL and WADS share the same building as well as the same owners and the same computer system. Dispatches are made from facilities in Indianapolis, Cincinnati and Ft. Wayne. Defendant Gary Giles ("Mr. Giles") is the primary decision maker in these businesses and Defendant Cynthia Giles ("Ms. Giles") is second in command. Other employees serve in interlocking positions. Since February 27, 2012, according to Plaintiff, 179 independent contractors have made deliveries for WADS using their own vehicles, 70 of whom were engaged in route work, 20-24 were doing distribution work and 35-45 were doing on-demand work.

The services performed by the drivers depends upon the work available from Wheels Logistics' customers, the type of work the drivers choose to perform, and each driver's individual schedule. The Drivers' individual experiences differ depending on the type of work they perform. For example, Drivers who do Route Work automatically report directly to the customer's facility and do not come to the Indianapolis Facility to complete the route. Drivers who do Distribution Work report to Wheels Assureds' facilities to pick up the freight before delivery, and drivers who do On-Demand Work report to the location of whatever pick-up they happen to have first on any given day. The level of communication between the customers and drivers, and between the drivers and

4

WAD, WAL, and/or the party with whom they contract, also differs based on the type of work the drivers performed. Likewise, the amount of time a driver has to dedicate to non-work related matters, such as errands, also varies based on the type of work.

Some drivers perform one type of work exclusively, while others choose to do a mixture of different types of work. For example, some drivers who do Distribution Work will also accept On-Demand Work either while they are completing the Distribution Work or afterwards. The drivers' experiences also differ depending on which customer they are servicing. Some customers require delivery drivers to wear uniforms, while others do not. Some have specific time frames within which to complete a delivery, some require deliveries to be completed by a certain deadline but not in a particular order, and some have requirements regarding the order in which deliveries or pickups are made. Likewise, some customers require drivers to complete paperwork, others do not.

The drivers' compensation is also calculated in different ways depending on the type of work they choose to do. All route drivers are paid a flat fee on a per route basis as are all distribution drivers. Some drivers choose to cover routes that only take a few hours to complete; other Drivers choose to cover routes that take longer. The total number of hours worked each week varies from driver to driver and the fees are negotiated at the time the driver is assigned the work. On-demand work, on the other hand, is paid based upon the size of the vehicle the driver is using, which typically include: passenger cars, smaller trucks, vans and cargo vans. Depending on the weight of a particular vehicle the percentage paid of the total for the job can vary between 55% and 65%. Some drivers wear uniforms and some do not; Ms. Armstrong chose not to. If a customer has a

5

complaint about a driver, the customer contacts a customer service representative who works for WAL.

WADS has never kept track of the number of hours worked by the drivers nor has it kept track of the number of miles driven by drivers. All drivers are charged an administration fee of $10.00 on a weekly basis, which fee is paid to WADS. The drivers' payroll checks were processed through WAL/WADS computer system.

Ms. Armstrong claims in this litigation that Employers failed to pay its drivers, including her, minimum wages for all the hours they worked during a workweek when they failed to pay them a mileage reimbursement. The failure to pay mileage, she says, decreased the amount of money they received for performing deliveries on behalf of Employers to less than the minimum wage, in violation of federal law. This type of claim is often referred to as "inadequate reimbursement" and, as such, it can constitute a violation of FLSA. Ms. Armstrong has moved for conditional certification of the following FLSA Class to pursue this claim:

> All present and former delivery drivers who drove vehicles not ow[n]ed by Defendants and were not reimbursed for mileage or other vehicle expenses.

Dkt. 20 at 1.

Employers contend in response that Ms. Armstrong was not under contract with them, was not paid by and had no business communication with any of them during the approximately three month period of time for which she seeks payment of minimum wages under the FLSA. According to Employers, her employment was governed by an

6

independent contractor agreement between herself and 4 Fergz that ended in approximately May 2012. Her compensation for making these deliveries on behalf of BCT was paid by 4 Fergz. Employers further asserts that the three months related to Ms. Armstrong's claim at issue here occurred before the presumptive two-year statute of limitations. Finally, in terms of this collective action, Employers argue that Ms. Armstrong cannot fairly be viewed as "similarly situated" to other drivers due to the fact that her duties entailed deliveries on a single afternoon route for a single customer operating out of one location. Other drivers provided on-demand distribution and/or route work with different customers at different locations with varying requirements. As such, the Drivers' job responsibilities were all highly individualized.

## Legal Analysis

### I. Applicable Law

A lawsuit brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 201 *et seq*., invokes the Court's federal question jurisdiction under 28 U.S.C. § 1331. Sections 206 and 207 of Title 29 proscribe, respectively, the payment of wages by any employer to any employee that falls below minimum wage levels set by law, and requiring employees to work in excess of forty hours per week without receiving overtime compensation consistent with the statutory minimum levels. Section 216(b) authorizes a cause of action in damages for violations of §§ 206 and 207, providing in applicable part as follows:

> An action to recover the liability prescribed [herein] may be maintained against any employer … in any Federal or State court of competent

> jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Here, Ms. Armstrong has framed her complaint as a collective action claim to recover unpaid minimum wages under the FLSA to which she believes she is entitled, which she seeks permission to assert as a class action. Ms. Armstrong and the prospective class cannot recover on their claims under this statute unless the Court is persuaded they are, under the facts of their case and the applicable principles of law, employees rather than independent contractors. "Only employer-employee relationships fall under the FLSA." *Solis v. Int'l Detective & Protective Service, Ltd.*, 819 F. Supp. 2d 740, 749 (N.D. Ill. 2011). "An 'employee' is defined as 'any individual employed by an employer' … and 'employ' means to 'suffer or permit to work.'" *Id.* (quoting 29 U.S.C. §§ 203(e)(1) and 203(g)).

Ms. Armstrong contends that, rather than an independent contractor as Employers have characterized her, she and the prospective class members are actually employees of Employers. Unless Ms. Armstrong can establish that she was an employee of Employers, she is not entitled to FLSA benefits. Whether a particular individual or individuals are employees who are entitled to the FLSA protections as opposed to being independent contractors turns on the outcome of what is referred to as the economic realities test, which is intended to elucidate whether and, if so, to what extent employees are actually "dependent upon the business to which they render service." *Bartels v. Birmingham*, 332

U.S. 126, 130 (1947); *see also Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). Dependence in the FLSA context equals employment status.[2]

## II.  Conditional Certification Standard

An action for unpaid minimum wages may be brought under the FLSA "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). To prevail on her request for a collective action, Ms. Armstrong must make a threshold showing that she is similarly situated to the employees on whose behalf she is seeking to pursue this claim. *Campbell v. Advantage Sales & Mktg., LLC*, No. 1:09-cv-1430-LJM-DML, 2010 WL 3326752, at *3-4 (S.D. Ind. Aug. 24, 2010). "In FLSA cases based on misclassification claims, the precise duties and tasks performed by the employees are directly at issue." *Marshall v. Amsted Indus., Inc.*, No. 10-cv-0011-MJR-CJP, 2010 WL 2404340, at *7 (S.D. Ill. June 16, 2010).

In this circuit, courts generally follow a two-step inquiry. At the first stage, commonly referred to as the "notice stage," if the court makes a preliminary, conditional determination based on the pleadings and any accompanying affidavits that the members of the putative class are similarly situated, the plaintiff is authorized to give notice to

---

[2] In the Seventh Circuit, courts consider the following six factors in assessing the economic reality of the working relationship: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. *Lauritzen*, 835 F.2d at 1534-35.

potential class members permitting them to opt-in to the class. *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 438-39 (S.D. Ind. 2012) (citing *Campbell*, 2010 WL 3326752, at *3). After conditional certification, "[t]he action proceeds as a representative action throughout discovery, and near the end of discovery, the court makes a factual determination of whether the plaintiffs are similarly situated." *Clemens v. Stericycle, Inc.*, No. 1:15-cv-01432-SEB-MJD, 2016 WL 1054605, at *2 (S.D. Ind. Feb. 17, 2016) (citing *Fravel v. Cnty. of Lake*, No. 2:07-CV-253, 2008 WL 2704744, at *2-3 (N.D. Ind. July 7, 2008)). At the notice stage, the plaintiff is required to make only a "modest factual showing" that the class members were "victims of a common policy or plan that violated that law." *Fravel*, 2008 WL 2704744, at *2-3. In determining whether conditional certification is appropriate, "the court must accept as true the plaintiff's allegations and does not reach the merits of the plaintiff's FLSA claims." *Clemens*, 2016 WL 1054605, at *2.

In cases in which the conditional certification of a collective action is being considered following enough discovery to make clear that a certification would not be appropriate, the court "can collapse the two stages of the analysis and deny certification outright." *Purdham v. Fairfax County Pub. Schs.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009); *accord Blaney v. Charlotte-Mecklenburg Hosp. Authority*, No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631, at *4 (W.D.N.C. Sept. 16, 2011). At this in-between stage, when substantial discovery has been conducted but discovery is not yet complete, an intermediate level of scrutiny is appropriately applied by the Court. *See, e.g.*, *Bunyan*

*v. Spectrum Brands, Inc.*, No. 07-CV-089-MJR, 2008 WL 2959932, at *3-4 (S.D. Ill. July 31, 2008).

In the case at bar, a significant amount of discovery has been completed, including the deposition of Ms. Armstrong, the sole named plaintiff, as well as Rule 30(b)(6) depositions of Wheels Systems and Wheels Logistics on certification issues. While discovery is certainly not completed, given the discovery that has already been conducted on the certification issues, an intermediate level of scrutiny is appropriate here. Our decision therefore is based on the factual record currently before us, which clearly establishes that conditional certification is inappropriate in this case.

## III. Discussion

Employers assert that Ms. Armstrong's motion for conditional certification must be denied because she has failed to establish that Employers had a common pay policy that allegedly violates the FLSA and that she is similarly situated to the putative class members. For the following reasons, we agree.

At the outset, we note that we are not persuaded that Ms. Armstrong is an adequate representative for the purported class as the evidence appears to establish that she was contracting with 4 Fergz during the relevant limitations period and had no contractual relationship with Employers. However, even assuming as Ms. Armstrong contends that 4 Fergz was simply another name under which WADS operated, her attempt to seek conditional certification still fails on the grounds explicated below.

11

In support of her claim that Employers have a common pay policy that violates the FLSA, Ms. Armstrong points to the following facts: (1) since February 27, 2012, there have been 179 Drivers; (2) the Drivers were paid a flat fee for the work performed; (3) none of the Drivers was paid mileage; (4) WADS has never kept track of the number of hours worked by the Drivers; and (5) WADS has never kept track of the number of miles driven by the Drivers.  Dkt. 38 at 8.  Ms. Armstrong contends that these five facts "conclusively demonstrate that Ms. Armstrong and her fellow Drivers were all allegedly misclassified as independent contractors and all paid in a same fashion for doing basically the same type of work, i.e. deliveries."  Dkt. 38 at 8.

At this stage of the litigation, we make no decision as to the ultimate issue of whether Employers have violated the FLSA.  However, assuming as Ms. Armstrong alleges that none of the drivers was paid mileage, this itself does not show that Employers had a common pay practice that allegedly violates the FLSA.  To prove a minimum wage violation under an "inadequate reimbursement theory," a plaintiff must prove the cost of the vehicle expenses actually "cuts into the minimum or overtime wages required to be paid him [or her] under the Act."  49 C.F.R. § 531.35.  Ms. Armstrong has made no such showing for the putative class.  Rather, she relies solely on her own example of being paid on a flat fee basis without mileage reimbursement to support the proposition that "she and her fellow Drivers are subject to a common pay policy which allegedly is in violation of the FLSA."  Dkt. 38 at 8.

12

The evidence before us shows that while some drivers were paid on a flat rate per route, other drivers were paid on a percentage of revenue, and some negotiated their pay per delivery. WAD Dep. at 14-15. The drivers also did not all work the same number of hours or drive the same number of miles each day. Given these distinctions among the Drivers, Ms. Armstrong's anecdotal evidence relating to only her own alleged underpayment is wholly insufficient to show that Employers had a common pay policy that allegedly violated the FLSA. *See Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) ("It is the opinion of the Court that a demonstration of [the defendant's] payment practice concerning two out of fifty employees (four percent of Defendant's workforce) does not rise to the level of a common policy or plan by [the defendant] that violated the FLSA.").

The discovery the parties have already conducted on the certification issues also confirms that the resolution of the Drivers' claims will require an individualized and highly fact intensive inquiry both to determine whether any of the drivers were misclassified as independent contractors rather than employees and, if so, as to the wages earned, hours worked, and miles driven by each allegedly misclassified driver to determine whether any violation of the FLSA occurred. The facts presented here are very similar to those before us in *Scott v. NOW Courier, Inc.*, 1:10-cv-971-SEB-TAB, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012), a case in which we denied conditional certification in a reclassification case under the FLSA for a putative class of drivers who provided courier services.

As was true in *Scott*, with regard to the issue of reclassification, the facts here related to Employers' alleged control over the Drivers "underscore the individualized nature of Plaintiff['s] contractual arrangement[] and compensation entitlements, and thus do not lend themselves to class-wide relief." 2012 WL 1072751, at *9. For example, the evidence adduced from the record shows that the Drivers exert considerable autonomy and independence both in choosing the types of routes they are assigned, including routed, distribution, an on-demand work, as well as with regard to their schedules, including the number of days per week and number of hours per day they work. In addition, Employers do not control the Drivers' off hours and in fact allow them to work for competing delivery services.

While Ms. Armstrong argues that all the Drivers perform "basically the same type of work, i.e. deliveries," (Dkt. 38 at 8), this characterization fails to take into consideration the relevant and significant differences among the Drivers with regard to, *inter alia*, their routes, their hours, their mileage, and the varying levels of interaction they have with Employers depending on the type of work they perform and the customers they are servicing. Given these differences, it is clear that resolution of the claims of the putative class will require individualized inquiries that are not suitable for class resolution.

For these reasons, Plaintiff's Motion for Conditional Certification is <u>DENIED</u>.

IT IS SO ORDERED.

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Date:  3/31/2016

14

Distribution:

Christopher J. Eckhart
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
ceckhart@scopelitis.com

Elizabeth M. Bolka
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
ebolka@scopelitis.com

Robert L. Browning
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
rbrowning@scopelitis.com

Ronald E. Weldy
WELDY LAW
weldy@weldylaw.com